THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | : |
| | : CRIMINAL NO. 3:18-cr-00310 |
| v. | : (JUDGE MARIANI) |
| | : |
| GILROY ST. PATRICK STEWART, | : |
| | : |
| Defendant. | : |

## MEMORANDUM OPINION
### I. INTRODUCTION AND PROCEDURAL HISTORY

Here the Court considers Defendant's Motion to Suppress Evidence (Doc. 68). With

the pending motion, Defendant seeks suppression of all tangible evidence seized from him

or from the vehicle he was driving on August 28, 2018, as a result of the traffic stop which

occurred on that date, all statements he made at the time or subsequent to the stop, and the

related testimony of law enforcement officers, their agents, and all other persons involved in

the traffic stop and subsequent search of the vehicle. (Doc. 68 at 17.) Defendant was the

driver and sole occupant of the vehicle from which the Pennsylvania State Police seized

approximately twenty kilograms of cocaine as a result of the August 2018 traffic stop. The

twenty kilograms of cocaine were found in a hidden compartment located inside the vehicle.

On September 11, 2018, a federal grand jury sitting in Scranton, Pennsylvania, returned a

one-count indictment charging Defendant with Possession with Intent to Distribute in Excess

of Five Kilograms of Cocaine, in violation of Title 21, United States Code, Sections 841(a)(1)

and 841(b)(1)(A). (Doc. 4.)

The Court conducted a hearing on the motion on April 28, 2021.  (Hr'g Tr., Doc. 77.)

The Government presented two witnesses: George Tessitore, the Pennsylvania State

Police Trooper who conducted the initial traffic stop on August 28, 2018, and Anthony

Doblovasky, a Pennsylvania State Police Corporal assigned to the Pennsylvania State

Police Canine Unit.  (*Id.*)   Defendant did not present any witnesses.  (*Id.*)  At the close of

the proceedings, a post-hearing briefing schedule was established.  (*Id.* at 165-67.)  The

parties have now filed their post-hearing briefs (Docs. 80, 81), and the motion is ripe for

disposition.  For the reasons that follow, the Court will deny Defendant's motion.

## II. FACTUAL BACKGROUND

On August 28, 2018, Trooper Tessitore was in a stationary position monitoring traffic

at mile marker 275.4 of Interstate 80 located in Carbon County, Pennsylvania.  (Hr'g Tr.

7:14-25, Doc. 77 at 7.)   He observed a Chrysler van displaying a New York registration to

have heavily tinted front windows, dark rear windows, and a large license plate frame which

obscured part of the license plate.  (Hr'g Tr. 8:1-14, Doc. 77 at 8.)  Trooper Tessitore

testified that both the window tint and the license plate frame would be violations of the

Pennsylvania Vehicle Code, sections 45.24(e)(1) and 1332(b)(3) respectively.  (Hr'g Tr.

8:14-17, Doc. 77 at 8.)

Trooper Tessitore followed the van westbound in his marked patrol car and initiated

a traffic stop.  (Hr'g Tr. 8:18-22, Doc. 77 at 8.)  His car was equipped with a Mobile Video

Recorder ("MVR") which, upon activation of the emergency lights, backs up about thirty

seconds and then records audio and visual with the Trooper wearing a microphone and a

dash-mounted camera facing forward to record the video.  (Hr'g Tr. 11:9-18, Doc. 77 at 11.)

## A. MVR Evidence

Submitted as Government Exhibit 5, the MVR recording shows that Trooper

Tessitore exits his patrol car and approaches the van on the passenger side at 18:28:16.[1]

Trooper Tessitore then identifies himself and asks Defendant, who was alone in the vehicle,

for his driver's license.  Defendant provides the license and says the he lives at the

Cleveland, Ohio, address displayed on the driver's license. Trooper Tessitore also asks for

the vehicle's registration and insurance information, which Defendant produces.  Trooper

Tessitore then explains the reasons for the traffic stop, stating that the vehicle has

excessively dark tinted windows and that the large plate frame around the license plate of

the vehicle prevetns the state of issuance – in this instance "New York" – from being clearly

visible. Trooper Tessitore asks whether Defendant was on his way back to Cleveland, and

Defendant replies "yes."  When asked where Baldwin, New York (the place where the

vehicle was registered) is located, Defendant laughs and says "you know where Baldwin is."

Trooper Tessitore responds that he does not know where Baldwin, New York, is and

receives no further response.  Defendant also said that the vehicle is registered to his "aunt"

and that he is returning to Cleveland from New York.  Trooper Tessitore asks how long

Defendant had been in New York, and Defendant initially replies "huh?" and then states

---

[1] All times referenced are indicated on the MVR, are in military time, and are approximate.

"just a couple days."  Defendant further explains that he had just taken his daughter back to school and is using the vehicle "temporarily."  He tells Trooper Tessitore that he is taking the vehicle back.

These events took place during the first two minutes of the stop—from approximately 18:28:40 to 18:30:04.  Thereafter, Trooper Tessitore tells Defendant that he will be back in a few minutes and returns to his patrol car, attempting to look through the windows of the van along the way.  At 18:34:20, Defendant exits from the driver's side of his vehicle and walks around to the rear of the van to view the license plate.  Trooper Tessitore then exits his patrol car and tells Defendant that he is not supposed to get out of the van.  (MVR 18:34:31.)  Trooper Tessitore then directs Defendant to stand next to the front passenger door of the police car and returns to his vehicle.   At 18:35:02, he asks Defendant how he came to possess the van since Defendant lives in Cleveland and the van is registered to his aunt in Baldwin, New York.  Defendant responds that his aunt "lives in Cleveland too." Defendant states, "she has that car, I took my daughter to New York," and that he is now "bringing the car back, that's all."  Defendant laughs and explains that his aunt goes back and forth (between Cleveland and New York) and that his aunt owns a nursing home in Cleveland, adding that it is very hard to own anything in New York.  (MVR 18:35:02 – 18:35:41).  Trooper Tessitore then asks whether Defendant is from New York or Cleveland, and Defendant responds that he lives in Cleveland.  Trooper Tessitore again inquires as to when Defendant went to New York, and he replies, "I told you, a couple days ago, to bring

4

my daughter back to school." When Trooper Tessitore asks where he stayed in New York, Defendant replies that "she stays at the University." Trooper Tessitore responds, "yeah that's where she stays, but where did you stay out in New York?" Defendant replies, "I have family in New York," and again laughs. (MVT 18:36:22.) Trooper Tessitore can then be heard on the MVR entering and receiving information.

At 18:40:10, Trooper Tessitore asks whether the registered owner of the vehicle resides at Defendant's address. After receiving a negative response, Trooper Tessitore then asks for the owner's address in Cleveland and, Defendant provides the address 664 South Green Road. More "beeps" can be heard on the patrol car computer.

At 18:42:10, Trooper Tessitore informs Defendant that he is going to issue him a "warning" for the vehicle code violations. At 18:44:18, Trooper Tessitore asks whether Defendant has his own vehicle and how he gets around. He replies that he does not have his own car but his girlfriend helps him get around. Defendant indicates that he had a car, but his daughter crashed it, so he had to sell it. Trooper Tessitore then asks what his daughter is going to school for, and Defendant replies, "right now, I mean she's doing her second year . . . she told me. . . oh, I want to be an accountant, then she wants IT . . . and I'm like, you're on a scholarship, I don't care, just graduate."

At 18:46:10, Trooper Tessitore asks what kind of work Defendant does, and he replies that he has a mechanic shop and also buys and sells cars at auctions. Defendant then talks about his daughter crashing his car in the summer and talks about buying another

5

vehicle, perhaps a truck.  Defendant then asks Trooper Tessitore about kids and engages in small talk, telling Trooper Tessitore that he is going through a divorce and likes to work out to stay in shape.

At 18:47:49, Trooper Tessitore states that he needs to verify some numbers on the vehicle and approaches the windshield of the van.  While at the front of the van, Trooper Tessitore can be seen speaking into his radio and heard saying "Five to Fern Ridge."  On his way back to the patrol car, Trooper Tessitore again looks at the tint on the windows of the van and comments "that's dark . . . you got tint on your tint."  Defendant responds that the windows are "factory issue."  Trooper Tessitore again looks at the rear window and says "I don't know . . . that's dark."

Trooper Tessitore then re-enters his patrol car and, at 18:49:05, again contacts the Fern Ridge State Police Barracks for back-up.  He repeats his request and, shortly thereafter, the dispatcher can be heard indicating that another unit is being sent to the scene.

At 18:52:14, Defendant asks, "so it's just a warning for [the plate frame] and the tint?"  Trooper Tessitore responds in the affirmative.  At 18:57:42, Trooper Tessitore tells Defendant, "It will just be a couple more minutes, I'm just waiting for some information to come back."  At 18:59:01, Trooper Tessitore asks for the specific name of the person to whom the van is registered.  Defendant replies, "I just told you that, Hazel, my aunt.

6

At 18:59:34, Trooper Tessitore exits the patrol car.  A back-up State Police unit has arrived on scene.  Trooper Tessitore hands Defendant the warning saying "there's your stuff, that's the warning I printed out."  Trooper Tessitore then asks Defendant whether there is anything illegal in the vehicle.  Defendant responds, "hell no!"  Trooper Tessitore asks whether there are any weapons, drugs or large amounts of money in the vehicle, and Defendant responds to each question in the negative.  At this point, Trooper Tessitore asks for Defendant's consent to search the van.

At 19:00:05, Trooper Tessitore tells Defendant, "My next step is, I'm gonna have you wait here. I'm gonna call for a narcotics canine to come down."  Defendant says, "You wanna search the car . . . Why?"  Trooper Tessitore states, "I have my reasons, I'm not going to discuss them.  You have the right to say 'no.'  Once you say 'no' my next step is to call for a canine.  I'm gonna have you wait [with the other Trooper who arrived on scene] while I call for a canine."  Defendant states, "You wanna search the car? I mean, there's nothing in there but my two bags."  Trooper Tessitore again explains that "you have the absolute right to tell me 'no.'"  Defendant states, "you could walk over there and open the car up . . . ."  Trooper Tessitore again indicates that he would like to search the vehicle and explains that he would like "to search for illegal firearms and any and all controlled substances."  Defendant replies, "I don't have anything."  Trooper Tessitore states, "I'm asking you if I can, yes or no." Defendant replies, "this is a joke."  Trooper Tessitore then says, "Okay, just wait here" and returns to his car.   (MVR 19:02:03.)

At 19:16:22, Defendant asks Trooper Tessitore if he can return to his van to get his asthma medication.  Trooper Tessitore accompanies Defendant to the van and retrieves the asthma medication.

At 19:20:13, Trooper Tessitore returns to his car after another officer enters the camera frame.  An off-screen person apparently in the vehicle comments that Defendant is nervous and Trooper Tessitore responds that Defendant appears "very nervous."

At approximately 19:39:56, Corporal Doblovasky and his drug detection dog, "Micho," arrive at the scene of the traffic stop.  At 19:43:16, Corporal Doblovasky introduces himself to Defendant, explains his duties, and tells Defendant that Micho is going to be run around the exterior of the van.  Corporal Doblovasky asks whether Defendant has any questions.  He replies "nope."  At approximately 19:48, Corporal Doblovasky deploys Micho and conducts a dog sniff around the exterior of the vehicle.  Based on the positive alert/indication from Micho, Trooper Tessitore and Corporal Doblovasky begin to search Defendant's vehicle.  The search concludes at 20:03:26 and Defendant is placed under arrest.  Thereafter the microphone goes off and the video ends as Defendant is being placed in the patrol car.  (MVR 20:05:01.)

## B. <u>Suppression Hearing Testimony</u>

Trooper Tessitore first testified as to observations made before and during the initial stage of the stop.  As the van approached and passed him, he noted that it was "traveling extremely slow, well below the average speed of traffic that day."  (Hr'g Tr. 8:3-4, Doc. 77 at

8

8.)  Trooper Tessitore testified that the van had an extra layer of tint over the front windows

and an extra layer of tint over the back windows "which is a very common indicator, very

common factor of a vehicle containing a hidden compartment." (Hr'g Tr. 8:5-10, Doc. 77 at

8.)  When asked if he was able to see the driver as he passed Trooper Tessitore's

stationary location, Trooper Tessitore responded that he could not.  (Hr'g Tr. 11:2-3, Doc.

77 at 11.)

After stopping the vehicle and being provided an Ohio driver's license in Defendant's

name and New York registration in the name of Hazel Sparkes of Baldwin, New York,

Trooper Tessitore asked Defendant where Baldwin, New York, was and Defendant

> let out an abnormal, just unordinary laugh.  As he was laughing . . . ,  he told
> me I should know where it was—or he told me I know where it is.  He never
> made it clear that he knew exactly where Baldwin, New York was, again,
> showing me he does not know where this vehicle originated.

(Hr'g Tr. 21:4-10, Doc. 77 at 21.)  Trooper Tessitore testified that Defendant's inability to

answer the question led him to "believe that, being that it's a third party vehicle, he is not

entirely sure exactly where this vehicle is registered to, where it originated, and if that

vehicle was just provided to him for trafficking purposes or smuggling  purposes." (Hr'g Tr.

20:8-12, Doc. 77 at 20.)  He also stated that a third-party vehicle is used to distance the

driver or occupant from ownership possession of that vehicle and such an arrangement is

commonly used with smuggling or transportation of contraband. (Hr'g Tr. 21:4-22, Doc. 77

at 21.)  Trooper Tessitore remarked that, when he asked who the vehicle was registered to,

"I was never told who, I was just told his aunt, at first." (Hr'g Tr. 20:13-15,  Doc. 77 at 20.)

9

Trooper Tessitore also took notice of a Black Ice air freshener hanging from the rear-view mirror.  (Hr'g Tr. 20:23-25, Doc. 77 at 20.)  He further noted that "if someone is traveling from New York to Cleveland, it heightens my awareness that they could be trafficking narcotics.  I have made many seizures that were going to the Cleveland area." (Hr'g Tr. 22:15-18, Doc. 77 at 22.)

Concerning the duration of the trip, Trooper Tessitore testified that Defendant told him that he had been in New York for

> a couple days, which is a very vague time line.  You know, it's commonly used, vague time lines are commonly used so they don't give out too much information about their travels.  If they have to conceal a story or prepare a cover story, they'll just give a vague time line of, a couple days, rather than an exact amount.

(Hr'g Tr. 23:3-8, Doc. 77 at 23.)   Trooper Tessitore also found it unusual that the license plate frame was very weathered and the plate itself had just been issued a year and a half before the stop.   (Hr'g Tr. 23:22-24:2, Doc. 77 at 23-24.)

Regarding Defendant's personal characteristics and mannerisms during the initial portion of the stop, Trooper Tessitore said that Defendant "looked straightforward, he wasn't looking over in my area for eye to eye contact.  I noticed him breathing extremely heavy, for him sitting inside of the driver's seat, I could see his chest and stomach rise and fall, breathing heavier that what the normal person breaths on a traffic stop."  (Hr'g Tr. 22:21-23:1, Doc. 77 22-23.)

Turning to the period when he returned to his vehicle, Trooper Tessitore reviewed

the registration plate information, ran a driver's license query, and performed a criminal

history check on the patrol car's computer ("MDT").  (Hr'g Tr. 24:21-25:4, Doc. 77 at 24-25.)

He said the beeps and typing heard on the MVR are the input and receipt of information into

the MDT.  (Hr'g Tr. 25:5-27:7, Doc. 77 at 25-27.)

Through the criminal history check, Trooper Tessitore learned that Defendant had a

prior criminal history in Ohio and Illinois—criminal mischief in Ohio and a Drug Enforcement

Administration ("DEA") money laundering case in Illinois which was for an arrest.  (Hr'g Tr.

27:5-13, 28: 1-4, Doc. 77 at 27, 28.)  Trooper Tessitore testified that

> [o]nce I see a money laundering charge and see that he has been involved with
> Federal agencies, what I would do, then, is send a message to our intelligence
> center, ask them to run a check of the vehicle and the occupants through EPIC,
> which is the El Paso Intelligence Center.

(Hr'g Tr. 27:13-17, Doc. 77 at 27.)

He explained that, at the time, EPIC could not be contacted directly, so he had to go

through the Pennsylvania Criminal Intelligence Center ("PACIC") to get information about

individuals involved in federal cases, a process which could take from fifteen to thirty

minutes.   (Hr'g Tr. 31:1-32:24, Doc. 77 at 31-32.)  Through this process, Trooper Tessitore

learned that Defendant was involved in a currency seizure in El Paso, Texas, which came

out of the DEA database.  (Hr'g Tr. 34:7-10, Doc. 77 at 34.)

When asked about the conversation that took place at approximately 18:42 about a

warning, Trooper Tessitore explained

[s]o what I will do is I will tell the occupant that I'm going to type them up a warning, this will put any worries of them getting a traffic ticket at ease.  Now they know they're getting a warning, I'll see if they relax a bit on the stop.  As I said, during the whole time, he's very fixated on that vehicle.  He's also breathing abnormally heavy, standing at my passenger side window, I can see his chest rising and falling, . . . just breathing extremely heavy, consistent with nervousness and fixated on that vehicle, with, again, in my experience and training, with what's inside that vehicle.

(Hr'g Tr. 39:21-40:6, Doc. 77 at 39-40.)

Trooper Tessitore confirmed that additional information continued to come in and it was at about this time that he sent a message for an additional unit to come to the traffic stop though he could not pinpoint the precise time he sent the message.  (Hr'g Tr. 40:24-41:3, Doc. 77 at 40-41.)  He said his reason for asking for backup was that, once he got information back from EPIC and no longer had queries to do, he intended to ask for consent to search the vehicle after he printed up the warning.  (Hr'g Tr. 42:1-6, Doc. 77 at 42.)  Trooper Tessitore added that he wants an additional officer present when he asks to search the vehicle for safety reasons—it is at that time that the occupant will know that he has looked beyond the traffic stop and has obtained reasonable suspicion and, if somebody is going to fight with an officer or to flee a traffic stop, "the likelihood of them trying to do something like that. . . when they're in the presence of two troopers, rather than one, is greatly reduced."  (Hr'g Tr. 42:7-43:5, Doc. 77 at 42, 43.)  Trooper Tessitore did not get a response to his initial request for a backup unit, so he sent another message, and at 18:51 was told another unit was being dispatched.  (Hr'g Tr. 48:3-21, Doc. 77 at 48.)

12

Trooper Tessitore explained that, by 18:59:34, the second unit was on scene, he had printed up the warning, and he intended to ask for consent after giving Defendant the warning.   (Hr'g Tr. 50:16-51:13, Doc. 77 at 50-51.)   When Defendant did not give consent to search, Trooper Tessitore called for the canine unit and, by 19:07:14, he had made contact with Corporal Doblovasky and informed Defendant that the canine unit was on its way. (Hr'g Tr. 57:14-58:19, Doc. 77 at 57-58.)   He confirmed that Corporal Doblovasky arrived on scene at 19:39 and the two spoke for several minutes to assess whether to conduct the canine search.  (Hr'g Tr. 60:12-61:4, Doc. 77 at 60-61.)

Corporal Doblovasky explained his general search methods and how he responds to a call, noting that when he responds from home, which he did on August 28, 2018, he immediately gets changed, gets the dog, and then goes to the call.  (Hr'g Tr. 144:22-25, Doc. 77 at 144.)  He also said that it is quite a distance from his home in northern Luzerne County to the scene of the traffic stop in Carbon County.  (Hr'g Tr. 144:8-16, Doc. 77 at 144.)

Corporal Doblovasky testified that he makes his own determination on reasonable suspicion after the officer on scene tells him what he believes to be reasonable suspicion— if he agrees he deploys his dog, and, if not, he does not deploy the dog.  (Hr'g Tr. 145:13-19, Doc. 77 at 145.)  In this case, he agreed with Trooper Tessitore and proceeded with the search of the vehicle.

13

After further describing his methodology, Corporal Doblovalsky narrated the sniff in this case beginning at about 19:47, noting that he conducted his introductory procedures, observed Micho exhibit "alert" behavior (which means he has detected an odor) and eventually observed Micho demonstrate indicating behavior (which means he has located the source of the odor).  (Hr'g Tr. 149:1-152:25, Doc. 77 at 149-152.)  Officers then searched the van and found a hidden compartment which contained 20 kilograms of cocaine.  (Hr'g Tr. 66:7-12, Doc. 77 at 66.)

### III. ANALYSIS

Defendant raises numerous arguments in support of his motion: 1) Trooper Tessitore unlawfully extended the traffic stop (Doc. 80 at 16); 2) Defendant was under de facto arrest as early as the inception of the traffic stop (*id.* at 28); 3) Defendant's Fifth Amendment rights were violated (*id.*); 4) the dog sniff was non-consensual, went beyond an open-air sniff, and was the result of improper encouragement and cueing (*id.* at 31); and 5) Defendant was the victim of selective enforcement (*id.*).  The Court will address each in turn but will first set out the general framework within which the events of August, 28, 2018, must be analyzed.

The Fourth Amendment provides that individuals shall not be subject to "unreasonable searches and seizures."  U.S. Const. amend. IV.  "The United States Supreme Court has held that stopping a car and detaining its occupants is a seizure under the Fourth Amendment."  *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir. 1995).

"[A] defendant who challenges a search or seizure typically bears the burden of

proving that it was illegal." *United States v. Headen*, 264 F. App'x 244, 246 (3d Cir. 2008).

"However, once the defendant has established a basis for his motion, i.e., the search or

seizure was conducted without a warrant, the burden shifts to the government to show that

the search or seizure was reasonable." *Johnson*, 63 F.3d at 245.  Here, because the

seizure of Defendant occurred without a warrant, the Government bears the burden of

showing that the seizure was reasonable.  *See United States v. Clark*, 902 F.3d 404, 409

(3d Cir. 2018) (citing *United States v. Benoit*, 730 F.3d 280, 288 (3d Cir. 2013); *United

States v. Coward*, 296 F.3d 176, 179 (3d Cir. 2002); *Johnson*, 63 F.3d at 245) ("The

Government bears the burden of showing (and presenting evidence) that the traffic stop

was unreasonable").

   "Generally, for a seizure to be reasonable under the Fourth Amendment, it must be

effectuated with a warrant based on probable cause." *United States v. Robertson*, 305 F.3d

164, 167 (3d Cir. 2002).  "A well-established exception to the Fourth Amendment's warrant

requirement permits an officer to 'conduct a brief, investigatory stop when the officer has a

reasonable, articulable suspicion that criminal activity is afoot.'" *United States v. Lewis*, 672

F.3d 232, 237 (3d Cir. 2012) (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)).

Accordingly, "[a] routine traffic stop is constitutional when it is supported by reasonable

suspicion." *United States v. Gooch*, 915 F. Supp. 2d 690, 702 (W.D. Pa. 2012); *see also

United States v. Delfin-Colina*, 464 F.3d 392, 397 (3d Cir. 2006) (holding that the

"reasonable suspicion standard applies to routine traffic stops").  It is well-established that a

15

police officer who observes a violation of state traffic laws may lawfully stop the car that committed the violation. *Pennsylanvia v. Mimms*, 434 U.S. 106, 109 (1977). However, "[w]here reasonable suspicion for the traffic stop is lacking, the evidentiary fruits of the traffic stop must be suppressed." *Lewis*, 672 F.3d at 237.

"Reasonable, articulable suspicion is a 'less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence.'" *Delfin-Colina*, 464 F.3d at 396 (quoting *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000)). "In forming a reasonable suspicion, officers may rely on their own experience and knowledge." *United States v. Jones*, 506 F. App'x 128, 131 (3d Cir. 2012). "When determining whether an officer possessed reasonable suspicion to conduct a traffic stop, [a court] must consider the totality of the circumstances." *Lewis*, 672 F.3d at 237. Further, "an officer need not be factually accurate in her belief that a traffic law had been violated but, instead, need only produce facts establishing that she reasonably believed that a violation had taken place. Consequently, a reasonable mistake of fact 'does not violate the Fourth Amendment.'" *Delfin-Colina*, 464 F.3d at 398 (quoting *United States v. Chanthasouxat*, 342 F.3d 1271, 1276 (11th Cir. 2003)); *see also United States v. Fleetwood*, 235 F. App'x 892, 895 (3d Cir. 2007) (noting that the standard for a traffic stop "is not particularly rigorous, as no traffic law need actually have been broken, nor does the stopping officer have to be correct regarding the facts").

Even if the initial traffic stop is properly supported, "a seizure lawful at its inception

16

can nevertheless violate the Fourth Amendment because its manner of execution unreasonably infringes possessory interests protected by the Fourth Amendment's prohibition on 'unreasonable seizures.'" *United States v. Jacobsen*, 466 U.S. 109, 124 (1984).

"[T]he tolerable duration of police inquiries in the traffic-stop context is determined by the seizure's 'mission'—to address the traffic violation that warranted the stop, and attend to related safety concerns." *Rodriguez v. United States*, 575 U.S. 348, 354 (2015) (internal citations omitted).  "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed." *Id*.

"In describing what inquiries qualify as 'unrelated,' *Rodriguez* drew a distinction between 'ordinary inquiries incident to' a traffic stop, which serve the purpose of enforcing the traffic code, and other measures aimed at detecting criminal activity more generally." *United States v. Green*, 897 F.3d 173, 179 (3d Cir. 2018) (citing *Rodriguez*, 575 U.S. at 355) (internal citation omitted).  Typically, ordinary inquiries "involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 575 U.S. at 355.  The Third Circuit has further held that "some questions relating to a driver's travel plans ordinarily fall within the scope of the traffic stop, as do delays caused by safety concerns related to the stop." *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) (citing *United States v. Givan*, 320 F.3d 452, 459 (3d Cir. 2003); *Clark*, 902 F.3d at 410).

17

When it comes to inquiries unrelated to the traffic stop, "there is no *de minimus* exception

to" the *Rodriguez* rule.  *Clark*, 902 F.3d at 410 (citing *Rodriguez*, 575 U.S. at 357).

Thus, "[a]n officer . . . may conduct certain unrelated checks during an otherwise

lawful traffic stop.  But . . . he may not do so in a way that prolongs the stop, absent the

reasonable suspicion ordinarily demanded to justify detaining an individual." *Rodriguez* at

355.  In other words, "[t]o lawfully extend a stop beyond when tasks tied to its initial mission

are completed or reasonably should have been completed, an officer must have an

objectively reasonable and articulable suspicion that illegal activity had occurred or was

occurring." *Garner*, 961 F.3d at 271 (citing *Rodriguez*, 575 U.S. at 355; *Clark*, 902 F.3d at

410).  If the officer possessed reasonable suspicion of criminal activity prior to extending the

traffic stop, no violation of the Fourth Amendment has occurred.  *See id*.

In his initial filing, Defendant stated that "the proof does not show the windows to be

impermissibly tinted; nor was Tessitore unable to read the license tag." [2]  (Doc. 68 at 10 ¶

57.)  This conclusory statement is not supported with specific citation or argument.

Defendant does not develop any related argument in his post-hearing supplemental brief

but rather states that "the proof may well have showed that Tessitore observed

impermissibly tinted windows and an obstructed license tag." (Doc. 80 at 16 (citing Hr'g Tr.

at 8).)  Because the record does not support a conclusion that Trooper Tessitore did not

---

[2] Defendant's initial filing does not comport with the Local Rules of Court of the Middle District of
Pennsylvania in that he did not file a separate supporting brief with his motion.  *See* L.R. 5.1(h), L.R. 7.5.

have reasonable suspicion to believe that Pennsylvania Vehicle Code violations occurred

and Defendant does not argue otherwise, the Court will address Defendant's argument that

Trooper Tessitore unlawfully extended the traffic stop.

## A. Extension of the Traffic Stop

Defendant first maintains that Trooper Tessitore prolonged the stop in violation of

*Rodriguez v. United States*, 135 S. Ct. 1609 (2015) and *United States v. Clark*, 902 F.3d

404 (3d Cir. 2018).  (Doc. 80 at 16.)  The Government contends that Trooper Tessitore

made a number of observations which would cause him to reasonably suspect that criminal

activity was taking place.  (Doc. 81 at 29.)  For the reasons that follow, the Court concludes

that reasonable suspicion supported the extension of the traffic stop.

When determining whether a traffic stop was unconstitutionally prolonged, a court

must first determine the "*Rodriguez* moment," meaning the moment that the traffic stop was

measurably extended for purposes of a Fourth Amendment analysis.  *Green*, 897 F.3d at

179, 181.  Once the *Rodriguez* moment is established, the Court must then assess

reasonable suspicion based on the facts available to the officer at that time.  *Id*. at 181.

"Determining when the *Rodriguez* moment occurred . . . is crucial to the analysis under

*Rodriguez* and its progeny, because any information that the police discover after the

*Rodriguez* moment cannot inform a court's analysis of whether the police had a reasonable

suspicion that a crime was being committed."  *Contreras v. Conrad*, No. 3:17-CV-02360,

2020 WL 2193429, at *6 (M.D. Pa. May 6, 2020) (citing *Green*, 897 F.3d at 179).

The moment the traffic stop was measurably extended is keyed from the time the mission of the stop ended, i.e., when "ordinary inquiries incident to'" the traffic stop ended. *Green*, 897 F.3d ay 179 (citing *Rodriguez*, 575 U.S. at 355).  As set out above, ordinary inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance, and some questions relating to a driver's travel plans."  *Rodriguez*, 575 U.S. at 355; *Garner*, 961 F.3d at 271; *Clark*, 902 F.3d at 410.

Defendant identifies three *Rodriguez* moments, the earliest being when Trooper Tessitore told Defendant he was getting a warning which occurred about fifteen minutes into the traffic stop.  (Doc. 80 at 19.)  The other identified *Rodriguez* moments are when Defendant receives the warning approximately thirty-three minutes into the stop and when Trooper Tessitore calls for backup approximately seventeen minutes into the stop.  (*Id.*)

Evidence of record arguably supports a conclusion that the mission of the traffic stop was ongoing at the time Trooper Tessitore told Defendant he would issue a warning rather than a ticket.  However, rather than parsing precisely when the mission of the traffic stop ended, the Court will key the requisite inquiry from Defendant's earliest *Rodriguez* moment, i.e., when Trooper Tessitore told him he would issue a warning rather than a ticket, and assess whether Trooper Tessitore could lawfully extend the stop based on the reasonable suspicion he possessed at the time that illegal activity had occurred or was occurring.

In this context, the reasonable suspicion standard "requires 'considerably less than

20

proof of wrongdoing by a preponderance of the evidence,' but requires more than a

'hunch.'" *Garner*, 96 F.3d at 271 (quoting *United States v. Sokolow*, 490 U.S. 1, 7 (1989);

*Terry v. Ohio*, 392 U.S. 1, 27 (1968)).  Courts invoke several common themes when

applying this standard:

> First, reasonable suspicion must always be evaluated under the totality of the circumstances. Accordingly, courts have consistently refused to adopt per se rules declaring a particular factor sufficient or insufficient to establish reasonable suspicion. Second, when assessing the totality of the circumstances, courts recognize the particular ability of law enforcement officers, based on training and experience, "to make inferences from and deductions about the cumulative information available to them that 'might well elude an untrained person.'" Third, and consistent with the totality of the circumstances approach, reasonable suspicion cannot be defeated by a so-called "divide-and-conquer" analysis, whereby each arguably suspicious factor is viewed in isolation and plausible, innocent explanations are offered for each. In *Terry* itself, the Court found there was reasonable suspicion to justify the temporary seizures even though each factor relied on by the officer, viewed in isolation, might have seemed perfectly innocent.

*Green*, 897 F.3d at 183 (internal citations omitted).

Defendant posits that Trooper Tessitore had no legal justification for extending the

traffic stop and he was acting on "nothing more than a hunch." (Doc. 80 at 20.)  More

specifically, he asserts that "the proof failed to show that Tessitore had concrete reasons for

his taking a combination of completely innocent factors and having that add up to a

suspicious amalgam." (*Id.* (citing *United States v. Bowman*, 884 F.3d 200 (4th Cir. 2018)).)

In its assessment of reasonable suspicion, the Government first looks to what

Trooper Tessitore knew in the first few minutes of the stop.  (Doc. 81 at 29-36.)  During this

time period, i.e., before he returned to his vehicle to conduct records and background

checks, the Government asserts that Trooper Tessitore became aware of twelve recognized

indicators of criminal activity.  (*Id.*)  Below the Court summarizes the indicators identified by

the Government.

- The van had excessively tinted windows which are a common indicator of vehicles used to transport contraband.  (*Id.* at 30 (citing *United States v. Meran*, Crim. No. 16-222, 2017 WL 4803927, at *3 (W.D. Pa. 2017) ("window tint is common on vehicles used to transport contraband"); *United States v. Leal*, 235 F. App'x 937 (3d Cir. 2007) (stop based on heavily tinted windows found to contain drugs); *United States v. Johnson*, 452 F. App'x 219, 226 (3d Cir. 2011) (vehicle stopped because of tinted windows found to contain cocaine and firearm).)

- Defendant was travelling on I-80, a known drug corridor.  (Doc. 81 at 30 (citing, *inter alia*, *Meran*, 2017 WL 4803927, at *3 ("Interstate 80 is a known major drug corridor."); *United States v. Givan*, 320 F.3d 452 (3d Cir. 2003) (defendant traveling on Route 80, a route often used for transporting drugs, in Luzerne County, PA, and had unusual travel plans); *United States v. Garner*, 961 F.3d 264, 271 (3d Cir. 2020) (defendant traveling through Pennsylvania on I-81, a known drug corridor, in a vehicle with a New York plate, multiple air fresheners and other factors); *United States v. Langley*, Crim. No. 3:15-CR-155, 2017 WL 4444208, at *6 (M.D. Pa. Oct. 15, 2017) (defendant traveling on I-80 in Monroe County and officer testified that I-80 was a "well-known drug corridor for illegal narcotic transportation"); *United States v. Perez*, 37 F.3d 510, 514 (9th Cir. 1994), *abrogated on other grounds*, 544 U.S. 93 (2005) (traveling on known drug corridor adds to reasonable suspicion).)

- Defendant was traveling from New York City, a known source of narcotics.  (Doc. 81 at 31 (citing *Meran*, 2017 WL 4803927, at *3 (New York City is a major source and consumption area for drugs); *Givan*, 320 F.3d 452 (New York City is known source city for drugs; reasonable suspicion found where defendant traveling from New York to Michigan, with a Michigan driver's license, and was pulled over for speeding on I-80 in Luzerne County, Pa.); *Garner*, 961 F.3d at 271 (defendant traveling from New York to Maryland through Pennsylvania on I-81, a known drug corridor, in a vehicle with a New York plate, multiple air fresheners and other factors).)

- Defendant's driver's license indicated he was from Cleveland, Ohio, he was

driving a car registered to an absent third-party female, and third-party
vehicles are commonly used by smugglers.  (Doc. 81 at 31 (citing, *inter alia*,
Meran, 2017 WL4803927, at *3 (". . . third party vehicles are commonly used
by smugglers, so that the individuals who are in the vehicle can claim they
have no knowledge of its contents."); *Givan*, 320 F.3d 452 (reasonable
suspicion found where defendant was speeding, operating a vehicle that
belonged to a third party, and traveling a route often used for transporting
drugs); *United States v. Prado*, Crim. No. 3:15-CR-151, 2017 WL 1653957, at
*7 (M.D. Pa. May 1, 2017) (defendant driving car that did not belong to him
formed part of reasonable suspicion); *United States v. Branch*, 537 F.3d 328,
340 (4th Cir. 2008) (defendant's "evident nervousness, the presence of air
fresheners, and the fact that he was driving a car not registered to him . . . in
combination [ ] could form the basis for reasonable suspicion of narcotics
trafficking."); *United States v. Iturbe-Gonzalez*, 100 F. Supp. 3d 1030 (D.
Mont. 2015) (defendant driving vehicle registered to another person).)

- Defendant distanced himself from the vehicle by stating that he was only
  using it temporarily.  (Doc. 81 at 5 (citing *Meran, Givan, Prado, Branch,
  supra*).)

- There was an air freshener hanging from the rearview mirror and air
  fresheners are used by smugglers to mask the smell of drugs.  (Doc. 81 at 32
  (citing, *inter alia*, *Meran*, 2017 WL 4803927, at *3 ("air fresheners in the van .
  . . are often used to mask the odor of narcotics"); *United States v. Pena-
  Gonzalez*, 618 F. App'x 195, 199 (5th Cir. 2015) ("We have long recognized
  that the presence of . . . air fresheners. . . suggests a desire to mask the odor
  of contraband"); *Prado,* 2017 WL 1653957, at * 7 n.4 (trooper explained that
  air fresheners "are commonly used by traffickers to mask the odor of illegal
  narcotics that are in the vehicles").)

- When asked about the location of Baldwin, New York, the address of the
  vehicle registrant identified on the registration whom Defendant referred to as
  his aunt, Defendant exhibited an "abnormal" laugh and did not answer the
  question.  He also identified her as "Hazel, my aunt" rather than giving her full
  name.  (Doc. 81 at 33.)

- In addition to the heavily tinted windows, the back windows also had sun
  screening shades which were pulled down.  (*Id.* at 34.)

- Defendant exhibited signs of nervousness including breathing heavier than

what a normal person breathes during a traffic stop and avoiding all eye contact with Trooper Tessitore. (*Id.* (citing, *inter alia*, *United States v. Chatterpaul*, 200 F. App'x 147 (3d Cir. 2006) (finding troopers had reasonable suspicion of criminal activity to justify additional detention based upon nervous behavior of car occupants and other factors); *United States v. Johnson*, 434 F. App'x 159 (3d Cir. 2011) (defendant's behavior during traffic stop, including fact that defendant appeared nervous and other behavior, provided trooper with reasonable suspicion to detain defendant for further investigation of drug offense); *Givan,* 320 F.3d 452 (defendant appeared nervous and fidgety); *Prado,* 2017 WL 1653957(defendant appeared nervous during interaction with police); *United States v. Dion*, 859 F.3d 114, 126 (1st Cir. 2017) (finding defendant's nervousness contributed to reasonable suspicion); *United States v. Gillard*, 847 F.2d 21, 25 (1st Cir. 1988) (same); *Branch,* 537 F.3d at 340  (defendant's "evident nervousness" added to reasonable suspicion); *United States v. Moore*, 795 F.3d 1224, 1230 (10th Cir. 2015) (nervousness and no eye contact with officer).)

- Defendant provided what Trooper Tessitore believed to be a vague timeline of his travels.  (Doc. 81 at 35 (citing *United States v. Holt*, 777 F.3d 1234, 1257 (11th Cir. 2015) (defendant's vague answers and inconsistent statements part of reasonable suspicion); *United States v.Calvetti*, 836 F.3d 654, 667 (6th Cir. 2016) ("inconsistent" and "suspicious" answers, and "vague" or "dubious" travel plans part of reasonable suspicion).)

- Before being stopped, Trooper Tessitore observed the van traveling at a speed well below the average flow of traffic as though the driver was "being extra careful to try not to be stopped by law enforcement."  (Doc. 81 at 35 (citing *United States v. Xiao Wu Zhou*, Crim. No. 4:17-CR-394, 2018 WL 1858187 (M.D. Pa. April 18, 2018) (Trooper observed truck on I-80 traveling "slower than the flow of traffic" adding to reasonable suspicion); *Langley*, 2017 WL 4444208 (defendant's driving added to reasonable suspicion).)

- The frame around the license plate which obscured the state of issue appeared to be very weathered and older than the license plate itself and was from California.  (Doc. 81 at 35.)

In addition to the indicators identified above which occurred in the first few minutes of

the stop, the Government points to the results of Trooper Tessitore's criminal history check

which initially revealed an arrest for "vandalism" or "criminal mischief" in Ohio and a

previous arrest by the DEA for the charge of "money laundering" in Illinois.  (Doc. 81 at

37.)

Defendant acknowledges that Trooper Tessitore testified on direct examination

about the observations that gave him reasonable suspicion.  (Doc. 80 at 23.)  However,

Defendant contends that each of the observations "are easily explained away as innocent.

(*Id.*)

This argument is unavailing in that the "totality of the circumstances" does not look at

each factor individually.  As this Court noted in *Prado*,

> [t]he Supreme Court . . . has rejected "this sort of divide-and-conquer analysis"
> and instead adopted a "totality of the circumstances" approach. *United States
> v. Arvizu*, 534 U.S. 266, 274, 122 S. Ct. 744, 151 L. Ed, 2d 740 (2002). Under
> this approach, "the whole picture ... must be taken into account," *United States
> v. Cortez*, 449 U.S. 411, 417, 101 S. Ct. 690, 66 L.Ed. 2d 621 (1981), and a
> police officer is permitted "to draw on their own experience and specialized
> training to make inferences from and deductions about the cumulative
> information available to them that 'might well elude an untrained person,'
> " *Arvizu*, 534 U.S. at 273 (quoting *Cortez*, 449 U.S. at 418). Thus, in the present
> case, although "[a]ny one of these factors is not by itself proof of any illegal
> conduct and is quite consistent with innocent travel ... taken together they
> amount to reasonable suspicion." *United States v. Sokolow*, 490 U.S. 1, 9,
> 109 S. Ct. 1581, 104 L.Ed. 2d 1 (1989).

*Prado*, 2017 WL 1653957, at *7.

As set out above, "reasonable suspicion cannot be defeated by a so-called "divide-

and-conquer" analysis, whereby each arguably suspicious factor is viewed in isolation and

plausible, innocent explanations are offered for each." *Green*, 897 F.3d at 183 (internal

citations omitted).  This Court recently applied this principle in *United States v. Washington*,

Crim. No. 3:20-CR-00047, 2021 WL 1588971, at *11 (M.D. Pa. April 22, 2021), agreeing

with the defendant that some identified facts might seem innocent in isolation but ultimately

finding that the totality of the circumstances established reasonable suspicion.  Review of

the factors identified in support of finding reasonable suspicion indicates that the same

conclusion is warranted here.

At the time Trooper Tessitore told Defendant he planned to issue him a warning, he

had "an objectively reasonable and articulable suspicion that illegal activity had occurred or

was occurring" and could thus extend the stop. *Garner*, 961 F.3d at 271.  Although the

timeline regarding when criminal history information came in from EPIC is imprecise, prior to

when Trooper Tessitore told Defendant he would issue a warning, he knew that Defendant

had a criminal history that included a DEA arrest for money laundering in Illinois.  In general,

"criminal history contributes powerfully to the reasonable suspicion calculus" in conjunction

with other factors. *United States v. Simpson*, 609 F.3d 1140, 1147 (10th Cir. 2010).  As

stated in *Green*, though the use of prior convictions or arrests is not sufficient to establish

reasonable suspicion, "'the use of prior arrests and convictions to aid in establishing

probable cause is not only permissible, but is often helpful. . . . This utility is enhanced when

the prior offenses relate to the crime being investigated." *Green*, 897 F.3d at 187 (quoting

*United States v. Conley*, 4 F.3d 1200, 1207 (3d Cir. 1993)).  Money laundering is a crime

recognized to be related to drug trafficking.  *See*, *e.g.*, *United States v. Massac*, 867 F.3d

26

174, 175 (3d Cir. 1989); *see also United Sates v. Lall*, ---F. App'x ---, 2021 WL 1103541, at

*1 (3d Cir. 2021).  Thus, Defendants arrest for money laundering is appropriately

considered a fact which strongly supports reasonable suspicion in this case.

Even without this information, Trooper Tessitore's suspicion that criminal activity was

occurring was objectively reasonable based on numerous factors including Defendant's

nervousness, his driving a vehicle registered to a third person, his imprecise answers to

questions related to the registrant and his use of the vehicle, his failure to provide a direct

response to the question of the location of the city of registration, and other recognized

indicators such as dark tinted windows, air freshener, and slow-speed travel.

As set out above, the Third Circuit Court of Appeals and district courts within the

circuit have found that reasonable suspicion existed under circumstances similar to those

presented here.  *See supra* pp. 21-24.  In *Washington*, the totality of the circumstances

upon which this Court found the trooper's suspicion objectively reasonable included nervous

behavior, vague and evasive responses to basic inquires, a trip to a location the trooper

knew was connected to drug activity, the driver's prior narcotics-related felony convictions,

his hometown was known to be a drug source city, he was traveling on Interstate 80, and

the trooper detected a strong odor of air freshener.  2021 WL 1588971, at *11 & n.5.  While

here Defendant had an arrest for a drug-related offense rather than drug convictions,

Defendant also had additional drug-related indicators identified above, such as travel in a

vehicle registered to a third person, darkly tinted windows, vague answers related to the

registration and third-party to whom the vehicle was registered, and an indisputably evasive

answer to the question of the location of Baldwin, New York.

In sum, the numerous indicators supporting Trooper Tessitore's reasonable

suspicion that criminal activity was occurring allowed him to continue the traffic stop with no

violation of the Fourth Amendment.[3]  *Garner*, 961 F.3d at 271.

## B. De Facto Arrest

Defendant asserts that he was in fact under de facto arrest as early as the inception

---

[3] In support of his assertion that "the proof failed to show that Tessitore had concrete reasons for his taking a combination of completely innocent factors and having that add up to a suspicious amalgam," Defendant cites the Fourth Circuit's decision in *United States v. Bowman*, 884 F.3d 200. (Doc. 80 at 20.) Though he does so without analysis (*see id.*), the Court has reviewed that decision and finds it distinguishable.

In *Bowman*, the Circuit Court reviewed the district court's conclusion that several factors articulated by the officer who conducted a traffic stop, taken together, established a "particularized and objective basis for suspecting ... that [the defendant] was engaged in criminal activity," and provided the justification required to "extend[ ] the traffic stop." 884 F.3d at 213. Those factors included the following: apparent nervousness, the presence of a suitcase, clothes, food and an energy drink inside of the Lexus, inability to supply the officer with a requested address, and statements that the defendant had been laid off recently and that he had recently purchased the Lexus via Craigslist. *Id.* at 214. The Circuit Court concluded that none of the factors standing alone provided a basis for a reasonable, articulable suspicion that the defendant was engaged in criminal activity. *Id.* at 218. *Bowman* also concluded that, taken together, the factors did not support reasonable suspicion that the defendant was engaged in criminal activity, finding that some factors relied upon by the district court were inaccurately assessed (the defendant was not in fact using "different, multiple vehicles," and the defendant had provided a reasonable explanation for not knowing the address and pointed to the GPS to locate it). *Id.*

Here, the Court has not found any factual inaccuracies in the factors relied upon by Trooper Tessitore. Importantly, numerous indicators of criminal activity identified in this case were not present in *Bowman*. Most notably, criminal history was not a factor in *Bowman* where here Defendant's arrest for a crime related to drug trafficking could "contribute[ ] powerfully to the reasonable suspicion calculus," *Simpson*, 609 F.3d at 1147.

of the traffic stop because he was never free to leave.  (Doc. 80 at 28.)  In this section of his

post-hearing brief, Defendant focuses on the fact that Trooper Tessitore never told

Defendant he was free to leave, in fact Defendant was not free to leave, and Trooper

Tessitore was neither reasonable nor diligent in pursuing his investigative stop.  (*Id.* at 28-

30.)

The Court of Appeals for the Third Circuit has observed that "[i]n certain

circumstances, it can be difficult to distinguish between a *Terry* stop, which requires only

reasonable suspicion, and a *de facto* arrest, which must be supported by probable cause."

*United States v. Johnson*, 592 F.3d 442, 447–48 (3d Cir. 2010) (citing *Sharpe*, 470 U.S. at

685).  In considering the durational aspect of a stop, *Sharpe* addressed the lower Court's

determination that the twenty-minute detention of an individual transformed a *Terry* stop into

a *de facto* arrest.  470 U.S. at 683.  Assessing the effect of duration on the Fourth

Amendment's reasonableness analysis, the Court noted its previous determination in

*Florida v. Royer*, 460 U.S. 491 (1983), "that 'an investigative detention must be temporary

and last no longer than is necessary to effectuate the purpose of the stop.'"  470 U.S. at 684

(quoting *Royer*, 460 U.S. at 500).  The Court also reviewed its continuing adherence to that

approach in *Place* where it clarified that "'[i]n assessing the effect of the length of the

detention, we take into account whether the police diligently pursue their investigation.'"

470 U.S. at 685 (quoting *Place*, 462 U.S. at 709).

*Sharpe* acknowledged that, in some instances, the Court's earlier cases may have

created "difficult line-drawing problems in distinguishing an investigative stop from a *de*

*facto* arrest."  470 U.S. at 685.  The Court then explained that

> if an investigative stop continues indefinitely, at some point it can no longer be
> justified as an investigative stop. But our cases impose no rigid time limitation
> on *Terry* stops. While it is clear that "the brevity of the invasion of the
> individual's Fourth Amendment interests is an important factor in determining
> whether the seizure is so minimally intrusive as to be justifiable on reasonable
> suspicion," *United States v. Place, supra,* 462 U.S., at 709, 103 S.Ct., at 2645,
> we have emphasized the need to consider the law enforcement purposes to be
> served by the stop as well as the time reasonably needed to effectuate those
> purposes. *United States v. Hensley,* 469 U.S., at 228–229, 234–235, 105 S.Ct.,
> at 680–681, 683–684; *Place, supra,* 462 U.S., at 703–704, 709, 103 S.Ct., at
> 2642–2643, 2645–2646; *Michigan v. Summers,* 452 U.S. 692, 700, and n. 12,
> 101 S.Ct. 2587, 2593 and n. 12, 69 L.Ed.2d 340 (1981) (quoting 3 W. LaFave,
> Search and Seizure § 9.2, pp. 36–37 (1978)). Much as a "bright line" rule would
> be desirable, in evaluating whether an investigative detention is unreasonable,
> common sense and ordinary human experience must govern over rigid criteria.

*Sharpe*, 470 U.S. at 685.  Having rejected the establishment of a bright line rule, the Court

concluded that

> [i]n assessing whether a detention is too long in duration to be justified as an
> investigative stop, we consider it appropriate to examine whether the police
> diligently pursued a means of investigation that was likely to confirm or dispel
> their suspicions quickly, during which time it was necessary to detain the
> defendant.

*Sharpe*, 470 U.S. at 686.  In this analysis, "the court should not indulge in unrealistic

second-guessing. . . . The question is not simply whether some other alternative was

available, but whether the police acted unreasonably in failing to recognize or to pursue it."

*Id.* at 686-87.

Defendant provides no meaningful argument to support his assertion that this was a

de facto arrest from the inception of the traffic stop because he was not free to leave. (*See* Doc. 80 at 28-29.) Although he says that the traffic stop was a pretext to search the van without a warrant and, therefore, was a de facto arrest requiring probable cause, Defendant's conclusion is not supported by the authority cited above. *See supra* pp. 14-18.

Defendant's contention is also undermined by *United States v. Leal*, 235 F. App'x 937 (3d Cir. 2007) (not precedential). In *Leal*, the Third Circuit panel noted that "[a] suspect is not free to leave during a *Terry* stop" and concluded that a de facto arrest did not occur during the traffic stop at issue because, though the defendant was not free to leave, the officer did nothing to suggest the defendant could not leave immediately upon conclusion of the dog sniff if the dog did not find any evidence of drugs in the vehicle. *Id.* at 941.

Further, Defendant's citation to *United States v. Washington* in support of his de facto arrest assertion (Doc. 80 at 29) is misplaced in that this Court *did not* find that a de facto arrest had occurred in *Washington* but rather concluded that no Fourth Amendment violation took place when the defendant was detained for approximately fifty minutes. 2021 WL 1588971, at *16. Defendant's citation to *Davila v. N. Regional Joint Police Bd.*, 370 F. Supp. 3d 498 523, n.7 (W.D. Pa. 2019), (Doc. 80 at 28) is similarly without merit in that the cited footnote provides no support for finding a de facto arrest here. *Davila* did not reach the question of whether a de facto arrest had occurred because the District Court had concluded, as a matter of law, that the defendant was "subjected to a prolonged investigatory seizure without reasonable suspicion of any criminal wrongdoing." *Id.* (citing

31

*Sokolow*, 490 U.S. at 7).  Finally, Defendant's citation to *United States v. Langley* in connection with his criticism that Trooper Tessitore was determined to find criminal activity rather than conduct a traffic stop and he was going to do so without obtaining a warrant (Doc. 80 at 29) is unavailing.  Although the police officer in *Langley* seized the car after a dog indicated the presence of narcotics and thereafter sought a search warrant for the vehicle, nothing in the decision supports a conclusion that a de facto arrest would have occurred had a different procedure been followed, i.e.,  had the officer on scene searched the vehicle following the canine indication.  *See* 2017 WL 4444208, at *2-8.

In support of his assertion that a de facto arrest occurred because Trooper Tessitore was neither reasonable nor diligent, Defendant points to the fact that Trooper Tessitore waited until 7:02 p.m. to call for a canine when he believed, upon stopping Defendant, that he had reasonable suspicion to search the vehicle.  (Doc. 80 at 30 (citing *United States v. Washington*, 2021 WL 1588971, at *15, 17).)   First, as noted above, *Washington* does not support Defendant's claim that a de facto arrest occurred in this case.  In *Washington*, this Court discussed the analytical framework within which a de facto arrest claim is considered and concluded that no de facto arrest occurred, but the Court did not address the question of when a canine unit should be contacted.  2021 WL 1588971, at *14-16.

As set out above, the requisite analysis includes consideration of the law enforcement purposes to be served by the stop, the time reasonably needed to effectuate those purposes, and whether the police diligently pursued a means of investigation that was

likely to confirm or dispel their suspicions quickly. *See supra* pp. 29-30; *Sharpe*, 470 U.S. at

686; *Hensley*, 469 U.S. at 228–229, 234–235. Thus, a brief review of the timeline set out in

the MVR and relevant hearing testimony is appropriate.

After pulling Defendant over for traffic violations, Trooper Tessitore completed tasks

ordinarily associated with a traffic stop, which included informing Defendant why he pulled

him over, inquiring generally about travel, and running a check of the license and

registration provided by Defendant as well as a criminal history check. Assessing the drug

activity indicators and Defendant's criminal history, Trooper Tessitore sought backup for

officer safety because he planned to ask for consent to search the vehicle after he gave

Defendant the warning. (Hr'g Tr. 42:1-43:5, Doc. 77 at 42-43.) It appears from the MVR

and Trooper Tessitore's testimony that he did not receive a prompt response to his initial

request for backup but a dispatcher responded to his repeated requests sent between

18:47:49 and 18:49:05. *See supra* pp. 6, 12. The second unit arrived by 18:59:34,

approximately thirty-two minutes into the stop. Roughly seven minutes later, by 19:07,

Trooper Tessitore made contact with Corporal Doblovasky to request the assistance of the

canine unit after Defendant denied consent to search the van. (Hr'g Tr. 57:14-58:19, Doc.

77 at 57-58.) Thirty-two minutes later, at 19:39, Corporal Doblovasky arrived on scene.

(Hr'g Tr. 60:2-61:4, Doc. 77 at 60-61.) Following a preliminary conversation with Trooper

Tessitore to assess reasonable suspicion and a brief conversation with Defendant, the

search with Micho began less than ten minutes after arrival on scene (MVR 19:48) and the

33

search continued for approximately fifteen minutes (MVR 20:23:06) with Corporal

Doblovasky and another officer conducting the interior portion of the search before

Defendant was placed under arrest.

As the Court determined above, Trooper Tessitore had reasonable suspicion to

extend the traffic stop when he called for backup.  In *United States v. Garner*, the Third

Circuit noted that a decision to call for backup for officer safety "is consistent with the

mission of any traffic stop."  961 F.3d at 272 (citing *Clark*, 902 F.3d at 410).  Notably, the

backup officer arrived thirty-seven minutes into the stop and the Circuit Court did not find

this delay unreasonable.  *Id.* at 268, 272.  Likewise, in this case, any delay attributable to

the backup officers' arrival is reasonable—backup was called for officer safety and, from the

inception of the stop to the call for backup and the arrival of backup, evidence shows that

Trooper Tessitore was engaged in reasonable investigatory procedures and practices.

As to delay related to the canine unit, *Garner* is also instructive.  Defendant's

suggestion that Trooper Tessitore should have called for the canine unit sooner (Doc. 80 at

30) fails in that *Garner* addressed a similar claim and found it to be without merit.  961 F.3d

at 272.  The Circuit Court concluded that the argument that the trooper should have called

for the canine unit before asking for consent to search failed "because we have observed no

lack of diligence by officers waiting to call for K-9 units until after the suspect has denied

consent."  *Id.* (citing *United States v. Frost*, 999 F.2d 737, 742 (3d Cir. 1993)).  Here,

Trooper Tessitore called the canine unit as soon as Defendant denied consent to search the

van and, pursuant to *Garner*, this timing cannot be deemed unreasonable.

Further, no evidence suggests that the length of time it took the canine unit to arrive, thirty-two minutes, is unreasonable.  Though longer than the seventeen minutes in *Garner* which was found reasonable, *id.* at 269, in *Washington*, this Court deemed a thirty-minute delay reasonable in almost identical circumstances: Corporal Doblovasky and Micho were traveling from Corporal Doblovasky's home in Luzerne County to I-80 in Carbon County. *See Washington*, 2021 WL1588971, at *15.  Thus, the Court finds that the thirty-two minute delay caused by the canine unit's travel time to the scene is reasonable.

Finally, the overall time of the stop in this case does not suggest a lack of diligence. This stop continued for approximately one hour and thirty-five minutes before Defendant was placed under arrest.  (MVR 18:28:16-20:23:26.)  In *Leal*, the Third Circuit panel concluded that the defendant's detention for one hour and twenty minutes "bumped up against the outer limits of a *Terry* stop."  235 F. App'x at 942.  The detention in this case too is at the outer limits of a *Terry* stop, but there is no basis to conclude that it exceeds that limit.  Part of the delay in this case can be attributed to the need for a repeat request for backup and the distance traveled from Corporal Doblovasky's home to the scene.  It is also noteworthy that the search of the vehicle in this case lasted for approximately fifteen minutes (MVR 19:48:00-20:03:26) where the search of the vehicle in *Leal* took approximately three to five minutes, *United States v. Leal*, 385 F. Supp. 2d 540, 545 (W.D. Pa. 2005).  Had the search in *Leal* been of similar duration to that which took place here,

the total time of the detention would be approximately the same.  Given these

considerations, the Court concludes that Trooper Tessitore and the canine unit proceeded

diligently in carrying out the mission of the traffic stop and further investigatory procedures.

Therefore, no Fourth Amendment violation occurred based on lack of diligence or

unreasonable delay and there was no de facto arrest.

## C. Fifth Amendment Violation

Defendant's Fifth Amendment claim is not clearly articulated.  (*See* Doc. 80 at 30-31

(citing *Miranda v. Arizona*, 386 U.S. 436 (1966); *Minnesota v. Murphy*, 465 U.S. 420

(1984)).)  However, the Court considers Defendant to be seeking suppression based on the

fact that he was not Mirandized before he was arrested.  This assumption is based on his

assertions that he "was essentially never free to leave," he was "in custody," and Trooper

Tessitore "was in fact conducting what was tantamount to an 'interrogation.'"  *Id.*

In *Berkemer v. United States*, 468 U.S. 420 (1984), the Supreme Court considered

the question of "whether a traffic stop exerts upon a detained person pressures that

sufficiently impair his free exercise of his privilege against self-incrimination to require that

he be warned of his constitutional rights."  *Id.* at 437.  The Court acknowledged that "a traffic

stop significantly curtails the freedom of the driver and the passengers, if any, of the

detained vehicle," but concluded that the principles of *Miranda* do not apply in the traffic

stop context just as they do not apply in the *Terry* stop context.  *Id.* at 439-40; *United States

v. Anderson*, 859 F.2d 1171, 1177 (3d Cir. 1988) (suspect not in custody though officer

36

conducted search of vehicle and occupants during traffic stop after receiving suspicious

explanations for presence of large quantity of cash); *Howes v. Fields*, 565 U.S. 499, 509-10

(2012) (a person temporarily detained as a result of a traffic stop is not in custody for

*Miranda* purposes); *Shatzer v. Maryland*, 559 U.S. 98, 113 (2010) (the "temporary and

relatively nonthreatening detention involved in a traffic stop or *Terry* stop does not constitute

*Miranda* custody"); *United States v. Ley*, 876 F.3d 103, 108-09 (3d Cir. 2017) (explaining

that a roadside interrogation during a traffic stop is not "custodial interrogation" for *Miranda*

purposes).

This authority establishes that Defendant was not subject to custodial interrogation

while detained pursuant to the traffic stop and subsequent investigation based on

reasonable suspicion that criminal activity was occurring or had occurred and he was not

subject to the requirements of *Miranda v. Arizona*.  Thus, Defendant's claim that his Fifth

Amendment rights were violated is without merit.

**D.  Dog Sniff**

Defendant maintains that the dog sniff was non-consensual, it went beyond an open-

air sniff, and it was the result of improper encouragement and cueing.  (Doc. 80 at 31.)  In

support of the assertion he cites *Illinois v. Caballes*, 543 U.S. 405 (2005), for the proposition

that an open-air sniff "does not run up against Fourth Amendment concerns" and *United*

*States v. Woods*, 445 F. Supp. 2d 1328, 1332 (M.D. Ala. 2006), for the proposition that if

"the dog sniff extends to the interior of an automobile, it is a search regulated by the Fourth

Amendment, and therefore requires consent." (Doc. 80 at 31.) Because the MVR does not

show that Micho searched the interior of vehicle, *Woods* has no application here. Further,

Defendant does not put forward any facts or argument to support the assertion that the dog

sniff was the result of improper cuing or encouragement. On the contrary, the MVR shows

Micho independently exhibiting alert and indication behaviors before Corporal Doblovasky

and another officer open the doors of the van  to conduct the interior search. (MVR 19:48-

20:23.) Thus, Defendant's assertions regarding the dog sniff are without merit.

## E. Selective Enforcement

Defendant's final argument is that he was the victim of selective enforcement in that

he was "targeted for this illegal search and seizure because he is black." (Doc. 80 at 31.)

He adds that

> [t]he stop of Mr. Stewart and Tessitore's determined effort to "find something"
> on Mr. Stewart could only be explained by the color of Mr. Stewart's skin.
>
> That being the case, . . . Tessitore engaged in impermissible selective
> enforcement of the law against Mr. Stewart because of his race or ethnicity, in
> violation of the Equal Protection Clause of the Fourteenth Amendment.

(Doc. 80 at 31-32 (citing *United States v. Gonzalez Segovia*, Crim No. 5:18-CR-558, 2019

WL 3530910 (E.D. Pa. Aug. 2, 2019)).)

"The fact that there was no Fourth Amendment violation does not mean that one was

not discriminatorily selected for a search." *Bradley v. United States*, 299 F.3d 197, 205 (3d

Cir. 2002). *Bradley* identifies two elements which a defendant must prove to make an equal

protection claim in the selective search context: (1) evidence that the government actor was

motivated by a discriminatory purpose and (2) that the government actor's conduct had a

discriminatory effect.  *Bradley v. United States*, 299 F.3d 197, 205 (3d Cir. 2002)

(citing *Washington v. Davis*, 426 U.S. 229, 238-42 (1976); *Chavez v. Ill. State Police*, 251

F.3d 612, 635-36 (7th Cir. 2001)).

    In *Gonzalez Segovia*, the Eastern District applied *Bradley* in the context presented

here--the defendant filed a motion to suppress based on constitutional violations related to a

search conducted pursuant to a traffic stop.  2019 WL 3530910, at *16.  First, the district

court concluded that, because a claim of selective enforcement is independent of a claimed

Fourth Amendment violation, "[t]hat the traffic stop, extension of the stop, roadside

questioning, and consent to search were all constitutionally permissible does not resolve the

claim that Defendant was targeted on account of his race."  *Id.* (citing *Bradley*, 299 F.3d at

205; *United States v. Avery*, 137 F.3d 343, 352 (6th Cir. 1997) ("The Equal Protection

Clause of the Fourteenth Amendment provides citizens a degree of protection independent

of the Fourth Amendment protection against unreasonable searches and seizures.")).

*Gonzalez Segovia* also identified the relevant burden: once a defendant makes a showing

of the two prima facie elements set out in *Bradley*, the burden shifts to the government to

articulate a legitimate, nondiscriminatory reason for the difference in treatment.  *Id.* (citing

*Stewart v. Rutgers, State Univ.*, 120 F.3d 426, 432 (3d Cir. 1997)). The party asserting an

equal protection claim then must rebut that reason as pretextual.  *Id.*

Defendant has put forth absolutely no evidence to satisfy his prima facie burden which requires far more than the conclusory statements contained in this three-sentence section of his brief.  (*See* Doc. 80 at 31-32.)  Defendant offers no evidence that Trooper Tessitore selectively stopped Defendant because of his race and did not elicit any such evidence at the suppression hearing.  Trooper Tessitore's undisputed testimony was that he could not see the driver as the vehicle passed him.  (Hr'g Tr. 11:2-3, Doc. 77 at 11.)  This testimony is credible and consistent with his testimony that the van had heavily tinted front windows.  (*See*, *e.g.*, Hr'g Tr. 8:5-6, Doc. 77 at 8.)  The MVR does not reveal that Trooper Tessitore was "determined to find something . . . [because of] the color of Mr. Stewart's skin" (Doc. 80 at 31).  Rather, as discussed at length in the Fourth Amendment context, the MVR shows an appropriate systematic approach to carrying out the initial inquiries related to the traffic stop, the follow-up document and record verifications, the establishment of reasonable suspicion of criminal activity, and the subsequent investigatory activities.  Based on the total lack of evidence that Trooper Tessitore engaged in selective enforcement, Defendant's equal protection claim fails.

## IV. Conclusion

For the reasons set forth above, Defendant's Motion to Suppress Evidence (Doc. 68) will be denied.  A separate Order will be filed with this Memorandum Opinion.

Robert D. Mariani
United States District Judge